We're dealing with a case involving a 4,000-pound machine moving along at less than half an and the person operating that machine has his back turned to the direction of its travel. He's looking south as the machine moves north, knowing the whole time that there's truss assemblers right there on the path of the machine. We have a safety bar held together with duct tape, if you can possibly believe that, and testimony that everybody in the plant knew about this condition for months. They reported it to management. Management said, don't worry about it. Fogel, the maintenance guy, will fix it. There's only one problem with that, Your Honors. Fogel declined to admit, he refused to admit that he was in charge of maintenance. They said, well, perhaps, maybe you spent over 5% of your time doing maintenance. No, he wouldn't even admit to that. I don't do maintenance. That was his response. So we have an employer here with a machine that was allowed to fall into complete disrepair and they don't have anybody in charge of maintenance. Now add all this up and look what you have. You end up with a lethal mixture of negligent maintenance, plainly visible to anyone who bothered to look at the machine, a failure to enforce safety rules designed specifically to prevent the accident that occurred in this case, a victim who knew the rules, knew he was supposed to leave the restricted safety zone, but decided to ignore those rules, as did most of his fellow workers. And finally, and most important, we have a machine operator who turned his back on the direction that he was moving the roof glider, knowing full well that the stop bar was in a state of disrepair. Now how do I know that? Skylar Priest was the operator. He's the one that had his back turned as they moved this 4,000 pound machine forward. He testified that the push bar system, and that's right at the bottom port side, that's where the duct tape was, he said this was a visible safety issue. Skylar Priest said, you cannot not see it. So the operator, the guy who knows that this machine is visibly a safety hazard, is the guy who turns his back and moves the machine the other way. What we have here is a very dangerous piece of machinery. It's very large, very dangerous. It's not dangerous by design, it's not dangerous when it left the factory, but in CIT's hands, it was extremely dangerous. It was an accident waiting to happen. Now how on earth do you hold the manufacturer responsible under these circumstances? Well they claim that we should have had extra safety devices. We should have had an electric eye, that might have done it. Trouble is those electric eyes, they need to be maintained as well, particularly in an industrial environment. Who's going to maintain them? I guess if they fall off, maybe somebody will duct tape them back on, that might do it. They said maybe if we put an actuator switch on both of the vertical pivot arms instead of one, well that might have done it. What happens when one of those switches malfunctions? Does anybody fix it? Who's the repairman here? Who's the one that's checking this machine to make sure that it's working? Fact is, if you can't fix it with duct tape, it doesn't get fixed. Not at CIT, not at the time of this accident. Now in my entire career as an appellate lawyer, I have never attempted to cram so many issues on appeal into a single brief. And it was quite a challenge. It violates every rule of appellate practice as far as I'm concerned. You're supposed to pick four issues, three, four, okay let's say five. What do we have? We have about seven with three sub-issues in there. It boggles the mind. At the same time, I don't know that I've ever encountered a jury trial that is so rife with error. Now I want to get to some of these errors, but before I do, I want to discuss, with court's permission, what I believe to be the crux of this matter. The one issue that resolves this entire case. That's proximate causation. Now manufacturers have no duty to design a product that is incapable of causing injury. We all know that. The injury must derive from a distinct defect in the product itself. Now if that defective condition merely creates a condition by which the injury is made possible, the existence of the defective condition is not the proximate cause of the injury. Now that's Hornbook law. It's referred to as the cause-slash-condition analysis. Now the key to this issue is that the intervention of the independent concurrent force will not break a causal connection if that intervention itself was foreseeable. So here are the questions this court, pardon me, the questions this court must ask. Was it foreseeable that CIT would allow the machine to fall into such repair, this repair, that it would allow safety devices to be held together with duct tape put on by the truss assemblers whose lives are at risk here? Was it foreseeable that the operator of the roof glider would turn his back to the truss assemblers while he moved the gantry, even though he knew that the stop bar was a safety issue? And finally, and possibly most important, was it foreseeable that a truss assembler, after hearing the buzzer, seeing the flashing light, and seeing the roof glider slowly moving forward at a mile an hour, mile and a half per hour, instead of leaving this restricted safety zone like all of his co-workers had, he decided to stay? Is that foreseeable from the manufacturer's point of view? Now in 1978, this court handed down a landmark decision, Bar v. Ravinius, subsequently upheld and cited with approval by the Illinois Supreme Court. It now stands as the law in Illinois on products liability litigation. Now the facts in that case are nearly identical to the facts in the case, using that word too much, the present case. In Bar v. Ravinius, you have an asphalt spreader being pushed forward by an operator who was looking the other way. The injured party, the plaintiff, had his back turned to the asphalt spreader. It struck his leg, resulting in amputation. Now, the court held, this court held, a manufacturer could not be expected to anticipate the failure of the operator to observe his path of progress. Now how is that different than what Skylar Priest did in the case of Bar? I think it's important to point out that in Bar v. Ravinius, we had one intervening cause, just one. We had the operator looking the wrong way as he moved the asphalt spreader forward. In this case, we have a multitude of intervening factors. We have the fact that the accident would not have occurred if CIT had merely maintained its equipment. It would not have happened if it had enforced its safety rules. And it should also be pointed out that in Bar, as I mentioned earlier, the plaintiff had his back turned to it. Here, in this case, the plaintiff was facing the machine. He saw it coming toward him. The buzzer sounded. The lights flashed. All of his co-workers did what they were supposed to do. They left the tables. If the plaintiff had merely stepped out of the way as he was taught, this accident would not have happened. Now, opposing counsel has tried to distinguish Bar v. Ravinius on the basis that the plaintiff in Bar was just a bystander. In fact, he was a worker. But as I understand it, they were taking this asphalt spreader, and they weren't laying down asphalt. They were moving it to a parking area to do maintenance on it. The operator, the plaintiff, Bar, had gotten off the machine. His back was turned. And this court found a basis decision on two fundamental rulings. And this is where I truly urge the court to look at the case carefully. Quite frankly, I missed it. I missed it when I read my reply brief. There are two separate rulings in Bar v. Ravinius. First, the court held that the protection afforded by concepts of strict liability in tort do not extend to bystanders. And that's what opposing counsel is relying on. And then, a little bit further on in the opinion, the court says, this is a quote, An equally important reason for affirming the judgment was the absence of proximate cause. Now, look at the opinion. The fact that the Bar was a bystander is never mentioned again. And why should it? The fact that proximate cause has nothing to do with whether a person's a bystander or a worker, that's a product's liability issue. This is a completely separate basis for the court's holding in Bar v. Ravinius. The fact that he was a bystander in Bar had nothing to do with this court's ultimate ruling, which was a failure to establish proximate cause. Notably, the court held that as a matter of law, they had failed to establish proximate cause. Now, you add all this up, and it comes down to this. This case should never have gone to trial. Summary judgment should have been granted on the basis of proximate cause. But it did go to trial, and the trial suffered from a number of very serious issues. I'd like to just address three of those issues with the court's permission. First, the trial court's refusal to answer the jury's question. Second, the trial court's decision to instruct the jury that defense counsel had violated court orders and that they should take that into account in assessing our single most important witness, our expert witness. And third, sustaining objections during closing argument. Now, during deliberations, the jury asked the court to resolve a simple problem. We had listed in our contribution claim against CIT seven charging allegations. They wrote to the judge. They said, did they have to prove all seven or just one? And the judge looked over the instruction. I brought a copy of it right here. This is it right there. It's for the court's reference. It's a common law record 9539, singles space. It's a fairly extensive instruction. And the court looked down to paragraph C and said, Skylar Priest committed one or more of the following. Well, then he looked up to paragraph A. That covers CIT. He says, boy, that one or more of the following is not included there. If you go up a little bit higher, it is. He says, but you've got to look for it. Now, this is a quote from Judge Gilfillan. He said, I quote, I see their confusion, unquote. He understood that a lay jury looking at this complex instruction might be confused. But nevertheless, he refused to answer the jury's question. All he had to do was say, no, they don't need to prove all. Or all he had to say is they only need to prove one or more of the following. He understood that the jury might be confused, but he refused to do that. And under Supreme Court precedent, jurors are entitled to have their questions answered. This was an abuse of discretion. On that basis alone, this verdict should be reversed. Second major trial error. Court instructed the jury that my text defense counsel had violated court orders because he gave transcripts of the trial so far to his expert witness. Well, you read the transcripts leading up to that hearing on the unlimiting order. The judge had even said, he goes, well, we're going to deal with this pretty much on a case-by-case basis. He goes, we're going to err on the side of inclusiveness. If it's possible, we have a witness who might change their testimony. Maybe we'll deal with that later on. But he granted the motion in limine. This is a standard, routine, in limine motion put in almost every jury trial. And its purpose is simple. You want to keep fact witnesses from changing and altering their testimony if they're called back on rebuttal. Counsel has two minutes. In this case, our expert told him that he had absolutely no change in his expert opinion. And yet the court went on to say that he had violated court orders and that that could be taken into account. That was extremely a prejudicial error. Finally, the third error. Closing argument. Had the defense counsel violated court order? No. Absolutely not. The in limine orders expressly said that we would be allowed to have a witness present whose presence was essential to our case. He was our sole expert witness. He was our most important witness in the case. Of course his presence was essential to presenting our case. Not only that, but under Federal Rule of Evidence 703, which the Supreme Court adopted 30 years ago, he has every right to base his opinion on trial testimony. That rule was recently codified four months before trial in the Illinois Rules of Evidence. This was a huge error on the court's part. My understanding is that the plaintiff's counsel bluffed him into making this ruling. And the result was to severely prejudice the testimony of our single most important witness. Finally, a closing argument. We have my text counsel talking about proximate cause. And here's what he says. He says the cause of this accident was not the roof glider. Well, there's proximate cause. That's one of our issues in this case.  It was failure to maintain. It was Skylar Priest not looking where he was going. He said the accident was also caused by the failure of Mr. Stone to leave the tables. The court sustained an objection and told the jury you must disregard that statement. So the last thing this jury heard before they went into the deliberations was Dustin Stone's conduct cannot be considered. It's stricken from the record. That undercut our argument. Your Honor, we urge the court to enter judgment NOV on the issue of proximate causation or in the alternative to grant a new trial. Thank you. Thank you, Mr. Henry. Mr. Reagan, you will go first. Yes. And we will split our time equally. May it please the court, my name is Mike Reagan. And together with Bruce Path, who is seated behind me, we represent the plaintiff, Dustin Stone. I'd like to say at the outset that in sharing Mr. Unrath's reminiscences here, I've never encountered an appellate brief so rife with issues from a trial which I respectfully suggest to you was so plain. But I have to get started here on this sort of panoply of things that he has set out before you. But I welcome the court's directing me to any issues which are on the court's mind. The verdict in the answer to the special interrogatory, which they never mentioned, even in the brief, both saying that the roof glider was an unreasonably dangerous product at the time it left Mitek's factory, was not contrary to the manifest way of the evidence. Even though Mitek says that the verdict is against the manifest way, it has not developed any argument to that effect. It's merely asked a series of rhetorical questions, and it wants to focus on Dustin Stone's conduct. But those questions are not really an argument, nor are they well-rounded in the evidence. His first statement to you this morning was that everybody in the plant knew about this condition for months. It's simply not true. The evidence is that neither the plaintiff nor his co-workers, such as his supervisor, nor Eshleman, nor Smith, knew anything about it. And Mitek didn't know about this defect which it had created, which became progressive because of the vibration causing the loosening of the screws. Statements and facts in both our brief and in CIT's brief are very specific, and I commend the court to the statements there. Dustin Stone's conduct was relevant to this case only on assumption of risk, and we'll take that up later. So this business of leaving the tables, et cetera, the court properly struck. The jury could not consider it because contributory negligence is not a defense. As for the unreasonably dangerous defect in the machine, the evidence is absolutely abundant. It far exceeds what's necessary. Is failure to leave the table, is that a contributory negligence or a sole proximate cause argument? Well, it is not sole proximate cause because the purpose of the safety bar, which is required by OSHA and under the expert evidence is required for a point of operation guard, is recognized as a foreseeable deed, that it is foreseeable that there will be somebody working in that area. The evidence is that people worked in that area all the time when the machine was moving. The evidence is that the plaintiff was instructed on how to use the bar by his supervisor. He saw his supervisor use it very often. He had used it successfully, and so it's not sole proximate cause. And you're asking a bar-related question, and I'll take that up in greater length when I get to it if I could. It talks about the fact that this point of operation guarding is required. That, by the way, separates this case from bar. I mean, there was no such – the guy wasn't using the machine. We'll get to that. But there was no evidence, either expert or OSHA, that something was required. Here there was. Here there is abundant testimony that if the guard had worked, that the injury would not have happened. The collars were attached to this bar with screws. Undergraduate engineers are trained, per the evidence, to know that vibrations cause these things to not work, you know, to vibrate. There were two bars, two vertical bars. There's a limit switch at only one of them, and what happens is when you pull the – when you push, as Dustin did, the far one, because of the looseness, it goes full length of travel. It does not activate the other switch, and there is no – there's no stoppage to the machine, and this incredibly tragic injury happened. You can look at Exhibit A-4 in the appendix to our brief. It's not Exhibit A-4. It's Page A-4 of our appendix, which shows the travel to which this thing was pushed and still not activating the stopping machine. This design would have been safe if it was welded as it had been in a prior version of this machine, if it had redundant switches on both vertical bars, or if it had light beams in a bumper system, which is demonstrated in the video, which is in the appendix to our brief, and which is sold currently, even then, by the way, on other machines which MyTech has. Well, expert testimony is abundant in all these points. The quotient verdict, the affidavits. I don't recall that Mr. Unrath even mentioned those in his argument, but Rule 606B of evidence is very stringently worded. It says a juror may not testify as to any matter of statement during the course of the jury's deliberations as to process, et cetera. And secondly, a juror's affidavit may not be received on those points. And we have the great joy, and I hope that somebody tells Justice Carter, that we have cited Lawrence Mansfield here on this exact point from 1785, saying that you cannot receive affidavits or testimony of jurors on quotient verdicts. Why do we even talk about quotient verdicts? Because without an evidentiary foundation, they don't exist in the law. Correct. They don't exist in the law. The court says, we will not honor those in any way. That's it. And secondly, they relate only to the allocation of fault between the defendant and the third-party defendant, and therefore they are utterly irrelevant to what's going on here, which is probably why he didn't mention them. The question from the jury, it is a purely discretionary question. It's a MITEC instruction. First of all, I ask you to keep this in mind. It is a MITEC instruction. It's their own instruction that they're now complaining about that might have been confusing. Secondly, thank you. It is absolutely standard IPI language. And, you know, the court explained. He exercised this discretion. It's in the record. He explained the preceding paragraph solves the problem. Approximate cause, abundantly proved. Barr versus Ravinius. It is what it is. 1978 opinion. There was a dissent. The far, far ‑‑ the contrasting opinion, and I'll leave it to the court to compare these, is Niffenegger, which expressly distinguished Barr, and it has a powerful sentence perhaps directed to your approximate cause question earlier. We conclude that it would be illogical to deny recovery for a plaintiff who was injured in the very way that the safety guards were designed to prevent, and they expressly disagreed with Barr and distinguished it. And Barr was not using the machine. We don't rely on the fact that he was a bystander. The appellate courts who distinguish Barr do. The evidence in the power of knee is not speculative. The knees are advancing because of the sacrifices which our people have made in our current wars, and to say that this is outlandish evidence is simply unsupported by the evidence. If the court would indulge me, just one thought here, if I could, please, and that is about the issues between MITEC and CIT, because we're not directly involved in those legally, but they have a great effect on us. He was injured on November 11th, 2008. His verdict was returned on September 2nd, 2011. In the trial court, plaintiff and CIT offered to stipulate to bring some order to this thing and even to stipulate to permit the trial judge to make decisions about the Kotechi set-off contribution, et cetera, and MITEC objected to any action by the trial court other than the entry of judgment and the full amount of the contribution. Two sentences, if I may, Your Honor. So at the October 6, 2011, post-trial hearing, the court commented on MITEC's stark position, and the court said, you don't give me much choice. Your choice is that MITEC should get a 3.9 million verdict against CIT. That's the choice I'm faced with, right? And the answer was yes. So what's here on... Yes, I thought the same thing. I do apologize. What's here in appeal is MITEC's choice below. It worked, even though it might not be the most elegant solution that you might craft if you had a clean sheet of paper. It was their choice. It may work out better for them, and it will work out with exactitude, and we think it would be unfair to send this back to now permit them to change their position and to do things differently than they were doing before. Thank you, and I apologize for being late. Thank you. And Mr. O'Connor? May it please the Court? My name is John O'Connor. I represent Central Illinois Trust in this matter, the employer. MITEC has filed an appeal arguing that the trial court was in error when it dismissed MITEC's contribution action against CIT when CIT agreed to waive its existing lien and agreed to be responsible for all future medical payments or work compensation benefits in the future. MITEC continually argues in its brief that CIT has escaped its liability by waiving its lien of $228,000. That is not the case. CIT agreed to waive that amount, the $228,000, and further agreed to not take any type of reimbursement for all the money it owes in the future. So at the end of the day, CIT and its insurer will pay all monies to Dustin Stone that it was responsible for under the Workers' Compensation Act. And it's exactly what the Kotecki v. Cyclops welding case says, is that an employer is only responsible for up to its workers' compensation exposure. The Supreme Court reaffirmed that in 1994 in the Lanning case,  and avoid any liability for contributions to other TOR feesers like MITEC. In 1998, the Supreme Court stated in Lefever v. Camelot Company that the employer could waive the lien post-trial, after the verdict has already been rendered, and have the contribution action dismissed. The purpose for all of this is that it holds the liability for an employer to the amount responsible under the workers' compensation laws. MITEC doesn't dispute that CIT had a right to waive its lien, but somehow it differentiates an employer whose lien is closed and an employer whose lien is open. While there are going to be times in cases, workers' compensation cases, where it's impossible for the work comp case to close, such as this one. Dustin Stone, the testimony revealed, is going to need medical care for the rest of his life.  MITEC cites no case law that suggests that my client somehow now has, does not have the Cortechi protection. It simply says, since the amount is speculative, they should pay the full contribution of 29% or $3.9 million. I'm sorry, sir? The statutory amount for loss of limb was paid. All that remains under the workers' compensation case is medical payments into the future, which is a substantial amount. MITEC argues that CIT somehow voluntarily proceeded to trial and therefore waived its Cortechi cap. No case law to support that. All of the cases discussing waiver, Bray, Licardi, Virginia Scherti, all involve an indemnification agreement in a contract where the employer has agreed to waive its Cortechi cap and be responsible for its full priority share. That did not happen in this case. Illinois law, MITEC argues that CIT should have somehow litigated the future workers' compensation exposure before trial. And this is an interesting issue, because before trial, MITEC brought a motion, a motion to determine the present cash value of the workers' compensation case, liability rather. MITEC came up with a number of $4.1 million and demanded that the court set that amount as the Cortechi cap or the set-off. MITEC argued in its reply brief, in conclusion, the determination of the present cash value of CIT's total workers' compensation liability by the court with reasonable certainty is necessary. So pre-trial, they think it's necessary, and then it can be done. However, post-trial, when the verdict comes back and they're not happy with the number, and the parties get together at that hearing and say, how can we stipulate to the future benefits owed so we can create that set-off, MITEC argues in its brief, the amount of CIT statutory liability for future workers' compensation benefit is disputed, undetermined, and unknown. As a result, if CIT's purported waiver of lien of any future workers' compensation benefits owed to plaintiff is too speculative to determine MITEC's right of contribution. Before trial, it's reasonable, it can be done. Post-trial, it can't be done. All of the cases cited in the briefs indicate that it will be improper for the trial judge to hear evidence and render a decision as to the present cash value of future benefits. Branham v. Slezak Corporation. The court recognized the trial court. It was attempting to bring closure to the proceeding but found that the court had to have a stipulation agreed by all parties in order for that to happen. The following case of Baltswell v. R&R Trucking. The Court of Appeals reversed the trial court, finding that the trial court's denial of the motion to dismiss when they decided to waive their lien was wrong, that the court could not set that amount, that there had to be a stipulation by the parties or determination by the industrial commission. So post-trial, MITEC realizes that if it stipulates, that amount is not going to be equal to $3.9 million, so it will simply not agree to stipulate and come to this court saying we're entitled to the full contribution, again, without any citation to case law. The only case that MITEC cites that favors this position is Cheney v. National Steel. It's a Fifth District case. Cheney's reasoning is flawed. Cheney relied on two cases, Freer and Sands, both Supreme Court cases. None of those cases, or rather, neither of those cases, said that it's proper for a trial court to determine the cap or limitation of an employer. For these reasons, the trial court was proper to dismiss the contribution action. MITEC basically handcuffed the judge by refusing to stipulate to the amount when both the plaintiff and CIT were ready to agree and then comes to court and argues that it's entitled to the full amount. Moving on to the other issue that MITEC raises with regards to CIT is the spoiliation claim. Counsel has one minute. The general rule that a party has no duty to preserve evidence. The case the court has to look at is one case and one case only, Martin v. Keeley and Sands. Supreme Court decision came down in October of 2012. It is identical to the facts in this case. In our case... There's one difference. In Keeley, didn't the employer call the manufacturer and tell them what had happened, so they put them on notice that day, virtually, and then the manufacturer says, if you get those two end pieces, we can remanufacture that? Your Honor, I think that actually the evidence in that case was conflicting as to whether there was a phone call made. There was conflicting testimony as to whether they reached out or not. But I think the main issue on the spoilation is the duty issue. And that is whether there is a duty at all, whether the CIT in this case somehow assumed a duty voluntarily to preserve that evidence the day after this accident all the repairs were done. The second day, OSHA was called out to look at it to make sure that it was safe to operate. My client showed no intent whatsoever to preserve that evidence. And because of that, there was no voluntary undertaking. My take also argues some type of special circumstances because we're an employer and we have a lien. The Keeley court addressed that very same issue and said the employee-employee relationship is not such that there is a special circumstance which would require that there be a preservation of the evidence. So with that, Judge, Your Honor, I believe that the evidence clearly showed that my client did not intend to preserve the evidence, there was no special circumstance, and therefore my take was not prejudiced in any way. Thank you. Mr. Unman. Thank you. Just briefly, a response that no one knew that the safety bar had fallen into a state of disrepair. We made the broad statement that, yes, everyone in the plant knew that. That's based on the testimony of one witness, Goldsmith, I believe. He said every employee on every shift knew about it. How does he know that? He worked staggered shifts. He worked all the shifts. We have Skylar Priest, who said it was a visible safety hazard. He cannot not see it. That's the basis of our conclusion, that everyone knew about this. Counsel also made the, I find, remarkable comment that Dustin Stone's conduct has no relevance to these proceedings other than assumption of risk. Well, number one, isn't that enough to create error in sustaining an objection at closing argument and ordering the jury to disregard Dustin Stone's statement? If it is relevant to assumption of risk, wasn't that an error? Reversible error, I would say. Furthermore, it is absolutely relevant to our contribution claim against CIT. It shows that CIT was not enforcing its rules to keep employees out of the restricted safety zone. So I believe that Dustin Stone's conduct is relevant not only to assumption of risk, not only to our contribution claim against CTI, but also, and I think centrally relevant, to our claim of failure to prove proximate cause, actually inability to prove proximate cause. What repairs were made the day after? Do you know? We don't know. As a matter of fact, no one knows. All we know is that the plant was shut down, and a day later it was fixed, and OSHA won't, we can't get any information from OSHA. So we have, no one knows the condition, actual condition of this machine at the time of the accident. Now, I will... What about afterwards? In other words, were the screws replaced or was something welded as opposed to screws? There were a number of different changes made. We know that OSHA went out and said, well, it looks like it's working, but nobody, we have no information of what was done or how it turned out. Later on, a protective order was issued, and yet we have testimony from Fogle. He said, well, he said, we made some changes after the protective order. He said, one of these changes, and it's a little vague here, but they took the safety bar from one side and reversed it to the other. Also, the C clamp on the top cord side, this is the side that Dustin Stone was pushing on, the screws were stripped, but those screws were thrown away. They were replaced, but they were thrown away. We also have testimony from Bob Fogle that he said, well, people can't, there were changes made after the protective order was entered. He goes, I think it was around the time one of those attorneys came out to inspect it. I think it was, he believed it might have been the MITAC attorneys. Now this, there's been a lot of talk here about Martin V. Keeley and how this has changed the duty analysis. Well, if we're dealing with changes made after a protective order was entered, then the duty analysis goes right out the window. We clearly have a duty, and we have a clear, genuine issue of material fact. We have a CIT employee who is stating it's possible that those changes were made after the protective order was entered. Briefly, on the contribution workers' comp claim, I just want to cover the procedural history. Prior to trial, we asked, we urged the court, let's reduce the workers' comp to present value. Everybody objected, the court ruled on their side. We said, well, your honor, can we be allowed post-verdict then to enter evidence, bring in evidence on this? He said, I don't see a problem with that. Well, sure enough, post-verdict, CIT's counsel and Stone's counsel objected. We asked for an evidentiary hearing. The judge reneged. He said, sorry, you don't get to have your evidentiary hearing. So they pulled out numbers from Dr. Linke, somewhere between $1.7 and $1.4, $1.8 million. They said, take it or leave it. Stipulate to those figures right now, or you can rely on Dustin Stone to litigate your claims and pay you piecemeal over the next 55 years. In other words, take these figures or you get nothing. That's the bargain that we were given. That is unfair. There's no support in the law on this. There's also no support for the notion that an employer can waive a lien based on benefits already paid, when there's a contribution verdict out there at $3.9 million. At some point, they have a right to waive their lien post-verdict. But before you waive that lien, you've got to ascertain its amount. You can't waive a lien that doesn't exist. We urge the Court to reverse. Thank you very much. Thank you, Mr. Chairman. I thank you all for your argument today. We will take this matter under advisement and get back to you with a written disposition within a short time. We'll now take a short recess.